**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DONAVAN CROSS,

    Defendant.

No. 16-CR-4067-MWB

**REPORT AND RECOMMENDATION
TO DENY DEFENDANT'S MOTION
TO SUPPRESS**

_____

## *I.*     INTRODUCTION

Before me is defendant's motion to suppress evidence allegedly seized in violation of the Fourth Amendment to the United States Constitution. Doc. 17. The grand jury charged defendant in a one-count indictment with possession of a firearm and ammunition as a felon and unlawful drug user. Doc. 2. The charge arose from an incident on June 4, 2016, when Sioux City police officers responded to a 911 call from defendant's grandmother stating that there was a physical fight between defendant and his girlfriend in the bedroom. Officers responded to the house defendant shared with his grandmother, arrested him on an outstanding warrant, and removed him from the scene. While accompanying defendant's girlfriend into the house with her consent while she recovered personal belongings, an officer observed a handgun in plain view. Officers obtained a search warrant which resulted in the recovery of additional incriminating evidence from defendant's house. Defendant argues that his girlfriend lacked apparent authority to consent to the officer's entry into defendant's house. Defendant seeks an order suppressing all evidence from the house.

The Honorable Mark W. Bennett, Senior United States District Court Judge, referred this motion to me for a Report and Recommendation. For the reasons that follow, I respectfully recommend that the Court deny defendant's motion to suppress.

## II. FINDINGS OF FACT

On November 1, 2016, I held an evidentiary hearing on defendant's motion. I admitted into evidence government's Exhibits 1 (a photo of Sophia Finauga, defendant's girlfriend), 2 (jail recording between defendant and his grandmother), and 3 (grand jury transcript of defendant's grandmother's testimony); and defendant's Exhibits A-1 through A-3 (photographs of the exterior and interior of the house), B (a two-page VINELink report regarding Sophia Finauga), and C-1 and C-2 (patrol car dash camera recordings). At the hearing, the government called Officer Paul Yaneff and Sergeant Jacob Hoogendyk of the Sioux City Police Department. Defendant called his grandmother, Andrea Cross, and Federal Public Defender's Office Investigator, Joseph Manser. I make the following findings of fact based on this evidence.

Defendant resided in a single-family house in Sioux City, Iowa, which he shared with his grandmother, Andrea Cross, and his minor child. The house was a rental house, and Ms. Cross was the only person listed on the lease. Defendant's girlfriend was Sophia Finauga. At the hearing, Ms. Cross testified that Ms. Finauga had been sleeping in the house "for days" and would occasionally do chores, such as cleaning dishes, but that she did not have a key and did not pay rent or expenses. Ms. Cross testified that the fights between defendant and Ms. Finauga upset her. Ms. Cross also testified that she did not like other people, including Ms. Finauga, staying at the house because it increased Ms. Cross's expenses. Ms. Cross testified that she had asked Ms. Finauga to leave before, but Ms. Finauga did not, and Ms. Cross did not press the issue because Ms. Cross tries to be a nice person.

In the late afternoon of June 4, 2016, Sioux City Police Officer, Paul Yaneff, and two other officers, responded to a 911 call made by Andrea Cross. Ms. Cross reported to the 911 operator that there was a physical fight between defendant and his girlfriend in the bedroom. Ms. Cross did not know Sophia's last name. Ms. Cross stated the officers could enter the house through the front door. The dispatcher related this information to officers, including Officer Paul Yaneff.

When Officer Yaneff and the other officers arrived at the house, they could hear a female voice screaming from inside the house. As officer Yaneff was about to call a supervisor to obtain permission to force entry into the house, Ms. Finauga ran from the house. The officers noticed visible bruising and scratches on Ms. Finauga's face. Officers thought she appeared fearful and scared. When Ms. Finauga noticed the officers, however, she ran back inside the house. She reentered the house through the front door from which she had just exited.

Police officers established a perimeter around the house and called on defendant by loudspeaker to exit the house. Defendant did not do so, even though officers called him by name seven to ten times over a five to seven minute period of time. A short while later, Ms. Finauga left the house. Officers took her to a safe location at the scene.

Officers continued to call over the loudspeaker two or three more times for defendant to come out of the house. Eventually, defendant came out of the house, naked, except for a hand towel he held over his genitals. He claimed he had been showering, but neither he nor the towel were wet. Officers handcuffed defendant. Officers determined there was an outstanding warrant for defendant's arrest. Officers took defendant back into the house and down a hallway where defendant recovered some clothing and the officers helped dress him.

The hallway accessed two bedrooms, one on the left and one on the right, and there was a bathroom at the end of the hall. While pointing out his clothing on the floor of the hallway, defendant attempted to shut the door to the bedroom on the left with his foot. After getting defendant dressed from clothes located in the hallway, officers took

him back to a squad car for a few minutes before transporting him to jail. While in the back seat of the car, officers questioned defendant about the injury to Ms. Finauga's eye, and also asked him about her living with him. Upon my review of the recording, I heard the following exchange:

> Officer: [Unintelligble]
>
> Defendant: She stays, she lives, she stays with her mother.
>
> Officer: Okay. She doesn't stay with you, though?
>
> Defendant: [shakes head, while yawning]
>
> Officer: No?
>
> Defendant: Well, she does, but not like . . . [yawns]
>
> Officer: Well, not full time?
>
> Defendant: [Unintelligible, with ambiguous facial expression]

Exhibit C-1 (starting at time mark 00:50 to 01:01). After this exchange, defendant said nothing more about the living arrangements and the officer returned to speaking to defendant about the eye injury.

Before defendant was taken to the jail, Sergeant Hoogendyk spoke on the telephone with Andrea Cross. Sergeant Hoogendyk testified that during this conversation, Andrea Cross told Sergeant Hoogendyk that Ms. Finauga had "recently moved back in" the residence. She stated that there had been many verbal fights between defendant and Ms. Finauga. Andrea Cross also testified about this conversation. She testified that she told the officer that Ms. Finauga could go back into the house to get her stuff, but then she wanted Ms. Finauga gone.

Officer Yaneff spoke to Ms. Finauga about what happened. Officer Yaneff testified that Ms. Finauga was hysterical and breathing hard. Ms. Finauga told Officer Yaneff that she had been in a relationship with defendant "for a while." She initially claimed her eye injury occurred when she fell into a table. Ms. Finauga soon admitted, however, that the injury to her eye occurred five days earlier when defendant assaulted her inside the residence. She told Officer Yaneff that on this occasion, June 4, 2016,

4

defendant physically assaulted her and broke her cellphone when she attempted to call the police.

Officer Yaneff asked Ms. Finauga if she wanted to call someone to come get her. He explained that she would not be able to live in the residence after this assault because there would be a no-contact order in place and she would not be able to live there if defendant got out of jail. Using one of the officer's phones, Ms. Finauga contacted her mother, who lived in Kingsley, Iowa, to come get her.

Officer Yaneff asked Ms. Finauga if she wanted to collect any of her personal belongings and if she had any inside. Ms. Finauga said she did have belongings inside and asked to collect them from the house and to leave with her mother. Officer Yaneff told Ms. Finauga that she could collect enough belongings to get by for a few days and if she needed to collect more later, she could arrange for an officer to accompany her. Officer Yaneff asked Ms. Finauga if it would be okay for him and a female officer to accompany her into the house while she collected her personal belongings in order to anticipate allegations that she took property she did not own. Ms. Finauga consented.

Officer Yaneff and the female accompanied Ms. Finauga down the hallway from which defendant had earlier grabbed his clothes. Ms. Finauga directed officers toward the bedroom on the left, stating that was where she slept. Officer Yaneff asked if he could stand in the doorway of that bedroom while Ms. Finauga collected some personal belongings. She agreed. When she grabbed a T-shirt from the laundry hamper, a Ruger 9mm caliber pistol fell out. When it hit the floor, the loaded magazine ejected from the pistol. Officer Yaneff saw it and immediately recognized it was a firearm. In response to a question from Officer Yaneff, Ms. Finauga denied any knowledge of the pistol. Officer Yaneff told Ms. Finauga to back away from the firearm, collect the two duffel bags of belongings she had filled, and other belongings she had already grabbed, and leave the residence.

Officer Yaneff then secured the residence and began applying for a search warrant. After obtaining a search warrant, officers found men's clothing, United States mail

addressed to defendant, and other personal items in the bedroom where the firearm had been located. In the bedroom across the hall, officers discovered 9mm ammunition, a pipe used to smoke methamphetamine, a marijuana pipe or bong, and clear plastic baggies with a white crystal-like substance that later tested positive as methamphetamine. In the bathroom, officers found a firearm holster that fit the 9 mm pistol, mail addressed to defendant, defendant's cell phone, defendant's debit card, and drug use paraphernalia.

After executing the search warrant, Officer Yaneff went to the jail to speak to defendant. Officer Yaneff informed defendant what officers found. Defendant denied using the bedroom on the left, where officers found the handgun. Defendant claimed he used the bedroom on the right.

During the hearing, the government introduced and played a portion of a recorded phone call between defendant and Andrea Cross.[1] Defendant was in jail at the time. During the phone call, defendant spoke with Ms. Cross about her testimony and statements she had made previously to the Federal Defender's investigator. Defendant asked Ms. Cross what she told the investigator about consenting to officers entering the residence. She replied that she said that Ms. Finauga could get her stuff and go. Defendant replied angrily "that's not what you're going to tell them." A heated exchange followed at the conclusion of which defendant persuaded Ms. Cross to testify that she did not give anyone consent to enter the house.

### III. APPLICABLE STANDARDS

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures, and requires a showing of probable cause. Fourth Amendment rights are personal in nature; in other words, a person can assert a Fourth Amendment claim only as to property in which a person has a reasonable expectation of privacy. *United States v. Douglas*, 744 F.3d 1065, 1071 (8th Cir. 2014). That right to privacy

---

[1] During a portion of the call, defendant also speaks to his minor child.

6

exists where a defendant asserts a subjective expectation of privacy, and that expectation is reasonable and one society is willing to accept. *United States v. Kiser*, 948 F.2d 418, 423 (8th Cir. 1991). Accordingly, police do not violate a defendant's Fourth Amendment rights when they seize property from a third party, even if that seizure would have violated the third party's Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).

Police entry into a house without a search warrant is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). The Fourth Amendment does not prohibit the warrantless search of a house when police obtain valid consent. *United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010). Police may enter a residence with the consent of any person who owns the residence or who possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). The government bears the burden of proof to establish the existence of effective consent. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (holding that the government has the burden of showing that consent to search was "freely and knowingly given").

Police entry into a house does not violate the Fourth Amendment if the person who grants consent does not actually own the property or have common authority over it so long as the officers "reasonably . . . believe" the person giving consent resided in the house. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). Thus, a consent search is valid if "'the facts available to the officer at the moment . . . [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" *United States v. Amratiel*, 622 F.3d 914, 916 (8th Cir. 2010) (quoting *Rodriguez*, 497 U.S. at 188). This is so, even if the person actually lacks a sufficient expectation of privacy in the house to grant consent. *See United States v. Hudspeth*, 518 F.3d 954, 958 (8th Cir. 2008) (en banc), quoting *Rodriguez*, 497 U.S. at 185-86 ("'[O]f the many factual determinations that must regularly be made by agents of the government,' the Fourth Amendment does not require the agents always be correct, 'but

that they always be reasonable.'"). *See also United States v. Almeida–Perez*, 549 F.3d 1162, 1169-70 (8th Cir. 2008) (explaining that even where police are mistaken as to a third party's actual authority, the search is legal if the circumstances lead the police reasonably to believe that a third party with common authority has consented).

Common authority over premises exists where there is mutual use, and joint access or control. *See Matlock*, 415 U.S. at 171 n.7 (noting that common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right."). There exists a continuum along which some third parties have the authority to consent to a search, while others do not. Spouses and live-in girlfriends, for example, have the authority to consent to a search. *See*, *e.g.*, *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009) (holding that a defendant's girlfriend who had unrestricted access to the house for three months had common authority); *United States v. Jones*, 193 F.3d 948, 950 (8th Cir. 1999) ("[A]n adult co-occupant of a residence may consent to a search"); *United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) (holding that "a spouse presumptively has authority to consent to a search of all areas of the homestead."). An overnight guest has a reasonable expectation of privacy in a residence sufficient to grant consent to search it. *Minnesota v. Olson*, 495 U.S. 91, 96 (1990). On the other hand, a neighbor asked to watch a house while the homeowner was gone lacks authority to consent to a search of the house. *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980). Similarly, a person who only frequented an apartment, but did not reside there, does not have the authority to consent to a search of the apartment. *United States v. Harris*, 534 F.2d 95, 97 (7th Cir. 1976). It is not necessary for the third party to have a key to a house to have authority to grant consent to search. *Iron Wing v. United States*, 34 F.3d 662, 665 (8th Cir. 1994).

In determining whether an officer could reasonably believe a girlfriend or other house guest had the authority to grant consent to search, courts look to the totality of the circumstances, including what the third party claimed to be his or her connection to a

house. *See*, *e.g.*, *United States v. Weeks*, 442 Fed. App'x 447, 453 (11th Cir. 2011) (apparent authority in consent of girlfriend who had mutual use of defendant's apartment and shared a set of keys with defendant); *United States v. Meada*, 408 F.3d 14, 17 & 21 (1st Cir. 2005) (apparent authority in the consent of live-in girlfriend who requested the police's assistance in recovering her belongings and her cat from defendant's apartment where she told police she had been living there for two months, could enter in the defendant's absence, and that the defendant "had recently been violent toward her"); *United States v. Chavez*, No. CR 12–2060 JB, 2013 WL 1007727, at *1 (D. N.M. Mar. 6, 2013) (apparent authority found where third party told police he had been living in defendant's home for three or four months); *United States v. Bouie*, No. 1:08CR87DAK, 2010 WL 120015, at *7 (D. Utah Jan. 7, 2010) (actual and apparent authority in girlfriend's consent where she stated she had lived in defendant's home and maintained a key to the residence but did not pay for rent).

## IV. ANALYSIS

Defendant claims the officers violated his rights under the Fourth Amendment to the Constitution when they conducted an unlawful entry into and search of his house. Specifically, defendant argues Ms. Finauga did not have the apparent authority to consent to a search of the house. Defendant argues the Court should, therefore, order suppression of all evidence seized from the house. The government disagrees, and further alleges that defendant lacks standing to object to the search of the bedroom in which officers found the loaded handgun because defendant disavowed using that room. I will first address the government's assertion that defendant cannot challenge the seizure of the handgun, and then turn to whether officers reasonably believed Ms. Finauga had the apparent authority to consent to entry into the house.

### A. *Defendant's Standing to Challenge Seizure of Firearm*

Although the question of whether a search and seizure violates the Fourth Amendment rights of a particular defendant is often referred to as "standing," it is "more properly subsumed under substantive Fourth Amendment doctrine." *Rakas*, 439 U.S. at 139. Because Fourth Amendment rights are personal and may not be asserted vicariously, a court must first determine whether defendant had a legitimate expectation of privacy in the area searched or the item seized. *Rakas*, 439 U.S. at 133-44; *United States v. Morales*, 737 F.2d 761, 763 (8th Cir. 1984). If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no right to claim that they were searched or seized illegally. A defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched. *Rakas*, 439 U.S. at 130–31 n. 1; *Kiser*, 948 F.2d at 423. Factors relevant to this determination include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991).

There is no dispute that defendant resided in the house with his grandmother. Defendant challenges the officers' entry into that house. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks and citation omitted). A resident of a single-family home "possess[es] a reasonable expectation of privacy throughout the interior of the premises." *United States v. Werra*, 638 F.3d 326, 331 (1st Cir. 2011); *see also Washington v. Simpson*, 806 F.2d 192, 196 (8th Cir. 1986) ("The record . . . clearly demonstrates that Washington resided [in the house] and as such had an expectation of privacy in the premises and standing to present a fourth amendment claim.").

Because defendant was a resident of the single family home, he had a reasonable expectation of privacy in the house itself. Without entering the house, the officers would never have been in view of the bedroom that defendant later denied occupying. Without being in view of the bedroom, Officer Yaneff would not have seen the handgun. Therefore, that defendant denied or disavowed use of the left bedroom[2] is irrelevant to the Fourth Amendment analysis. Defendant has a reasonable expectation of privacy in the house as a whole. Therefore, defendant has standing to challenge the seizure of the firearm.

In summary, I find that defendant had a reasonable expectation of privacy in the whole house and can challenge the seizure of evidence from the house, wherever found.

### B. *Apparent Authority to Consent to Entry into the Residence*

Having concluded that defendant has the right to challenge the seizure of evidence obtained from entry into his house, I will turn now to whether the officers acted reasonably in relying on Ms. Finauga's apparent authority to consent to the officers' entry into defendant's house while Ms. Finauga retrieved her personal property. In assessing the constitutionality of the officers' conduct, it is important to take into account the totality of the circumstances and the context within which the officers acted. The fundamental touchstone of the Fourth Amendment is "reasonableness." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

In assessing the reasonableness of the officers' conduct, and the extent of Ms. Finauga's apparent authority to grant consent, the Court must consider the context and scope of the consent granted. The context here involved officers responding to a domestic abuse incident. Officer Yaneff had seen Ms. Finauga flee from the house, reenter it, and

---

[2] The admitted evidence at the hearing supports the conclusion that defendant did use the left bedroom, despite disavowing such use. Before the grand jury, Ms. Cross testified that "[defendant] wouldn't even hardly let me go in that room [the left bedroom]. If I – if he was in there and I'd push the door open, he'd tell me to get out." Doc. 33-2 at 4.

leave a second time. After officers arrested defendant and removed him from the scene, Ms. Finauga sought to reenter the house where she had stayed so as to recover personal property. The scope of the officer's request, and Ms. Finauga's consent, was limited to accompanying her while she recovered her personal property. Officer Yaneff did not seek, and Ms. Finauga did not grant, consent to search any part of defendant's house.

Thus, in assessing the reasonableness of Officer Yaneff's conduct and his assessment of whether Ms. Finauga had the apparent authority to grant consent, the Court must consider the limited consent granted. For example, had Ms. Finauga granted consent to Officer Yaneff to search the entire house, or even defendant's bedroom, a court might find that an officer could not reasonably believe she had the apparent authority to do so. Here, Ms. Finauga consented only to entry into the house while she collected clothes. Officer Yaneff never exceeded the limited scope of Ms. Finauga's consent, not even entering the bedroom while she recovered her personal belongings.

The totality of the circumstances supports Officer Yaneff's reasonable belief that Ms. Finauga had the authority to grant the limited consent to accompany her into the house. Officers knew from the 911 call that defendant had assaulted his girlfriend in the home. The assault occurred in a bedroom, implying at least to some degree the possibility that Ms. Finauga was at least an overnight guest. Officer Yaneff saw Ms. Finauga leave, re-enter, and then leave the house a second time. It is not unreasonable to interpret these actions as suggesting Ms. Finauga had more than a passing connection to the house. Had she been only there for a matter of hours, it seems unlikely she would have gone back into the house. Moreover, Ms. Finauga entered the house freely through the front door; she did not knock or otherwise seek permission to enter. When the officers arrested defendant, he stated that Ms. Finauga "stayed" there, albeit he appeared to agree with the officer's interpretation that she did not live there permanently. Ms. Finauga herself stated that she had been in a relationship with defendant for a while. She claimed to have been assaulted in the residence five days earlier and claimed she had personal belongings in the house. She did not state that she had resided elsewhere during that five-day period.

It was not unreasonable for officers to interpret her statements as suggesting she had lived in the residence for at least the prior five days. Ms. Finauga had to call her mother to come get her, suggesting she did not have a vehicle at the residence. This could reasonably be interpreted as suggesting that she resided there and had not, for example, driven there that day or the night before. Finally, Andrea Cross told Sergeant Hoogendyk that Ms. Finauga had "recently moved back in" the residence. She also told the Sergeant that Ms. Finauga could go back into the house to retrieve her belongings, but then Ms. Cross wanted her gone. It was reasonable for officers to interpret these statements as meaning that Ms. Finauga had been living in the residence for some time. All of these facts were known to the officers prior to accompanying Ms. Finauga back into the house.

Based on the totality of the circumstances, I find it was reasonable for the officers to believe Ms. Finauga had the apparent authority to consent to have officers accompany her into the house while she recovered her personal belongings. I find that Officer Yaneff never exceeded the scope of that limited consent. I find that while acting within the scope of the limited consent, Officer Yaneff saw a firearm in plain view. Thereafter, officers obtained a search warrant and seized all of the evidence pursuant to that search warrant. Therefore, I find that the officers did not violate defendant's Fourth Amendment right against unreasonable searches and seizures.

The parties presented some evidence at the hearing regarding whether Ms. Finauga was actually a resident of the house and had an actual expectation of privacy in the house. For example, the evidence established she was not on the lease, did not have a key, that Ms. Cross had asked her to leave on prior occasions; and therefore, Ms. Finauga may not have been a welcomed houseguest. I find these facts to be irrelevant to the Fourth Amendment analysis in this case. What is important in this case is whether it was reasonable for the officers to believe, based on the facts they knew at the time, that Ms. Finauga had the apparent authority to consent to the limited entry into the house. Whether she actually had that authority does not matter. *See Hudspeth*, 518 F.3d at 958. The purpose for suppressing or excluding evidence is to punish and deter police conduct that

violates constitutional rights. *Davis v. United States*, 564 U.S. 229, 241 (2011) ("[T]he harsh sanction of exclusion should not be applied to deter objectively reasonable law enforcement activity.") (internal quotation marks and citation omitted). Where, as here, the officers did not act wrongfully based on the evidence before them, then suppression is inappropriate even if it turned out that Ms. Finauga did not have actual authority to consent to the officers' entry into the house.

Nevertheless, I find in the alternative that Ms. Finauga had the actual authority to grant consent to search the room. The evidence before the Court established that Ms. Finauga had lived in the house for at least five days, had stayed in the bedroom with defendant, had contributed to the household at least by washing dishes, and had at least two duffle bags worth of belongings in the bedroom she shared with defendant. Although Ms. Cross had apparently asked Ms. Finauga to leave at some unknown time in the past, Ms. Cross had acquiesced in Ms. Finauga continuing to live in the home with defendant. These facts, together with all of the facts known to the officers, establish that Ms. Finauga was living in the house for some period of time sufficient for her to have a reasonable expectation of privacy in the house. Accordingly, I find Ms. Finauga had the actual authority to grant authority to officers to enter the house where she had been living.

## V. CONCLUSION

For the reasons set forth above, I respectfully recommend the Court **deny** defendant's motion to suppress (Doc. 17).

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to

14

appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

    **IT IS SO ORDERED.**

    **DATED t**his 4th day of November, 2016.

_____
C.J. Williams
United States Magistrate Judge
Northern District of Iowa