**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

DONOVAN CROSS,

   Defendant.

No. CR16-4067-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE'S REPORT AND
RECOMMENDATION
CONCERNING DEFENDANT'S
MOTION TO SUPPRESS**

_____

**TABLE OF CONTENTS**

*I.*  *INTRODUCTION AND BACKGROUND* ............................................................. *2*
  *A.*  *Procedural Background* ............................................................................ *2*
  *B.*  *Factual Background* ................................................................................. *3*
*II.*  *LEGAL ANALYSIS* ............................................................................................. *8*
  *A.*  *Standard Of Review* ................................................................................. *8*
  *B.*  *Objections To Report And Recommendation* .......................................... *12*
   *1.*  *Factual objections* ........................................................................ *12*
    *a.*  *Physical fight* ................................................................... *12*
    *b.*  *Handgun in plain view* ..................................................... *12*
    *c.*  *Finauga's sleeping in the house* ........................................ *13*
    *d.*  *Permission to enter the front door* .................................... *13*
    *e.*  *Cross's attempt to shut door* ............................................. *14*
    *f.*  *Finauga's moving back into the residence* ....................... *15*
    *g.*  *Physical assault* ................................................................ *15*
    *h.*  *Officers' motive for entry into house* ............................... *16*
   *2.*  *Legal Objection* ............................................................................ *16*
*III.*  *CONCLUSION* ................................................................................................... *18*

## I. INTRODUCTION AND BACKGROUND
### A. *Procedural Background*

This case is before me on United States Magistrate Judge C.J. Williams's Report And Recommendation To Deny Defendant's Motion to Suppress (docket no. 37). In his Report and Recommendation, Judge Williams recommends denying defendant Donovan Cross's Motion to Suppress all evidence seized from the house Cross resided in with his grandmother. I, therefore, undertake the necessary review of Judge Williams's Report and Recommendation.

On August 24, 2016, an Indictment was returned against Cross, charging him with being both a felon in possession of a firearm and being an unlawful user of a controlled substance in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(3) and 924(a)(2).[1] Cross subsequently filed a Motion to Suppress in which he seeks to suppress evidence found in alleged violation of his Fourth Amendment rights when the police unlawfully entered and searched his house. Specifically, Cross contends that his then girlfriend did not have the apparent authority to consent to a search of the house. Cross requests that all evidence seized from his house be suppressed. The prosecution filed a timely resistance to Cross's Motion. The prosecution argues that Cross lacks standing to object to the search of the bedroom where the police found a loaded handgun, because Cross denied using that room. The prosecution, alternatively, argues that the police reasonably believed Cross's girlfriend had the apparent authority to consent to entry into the house. The prosecution further argues, again in the alternative, that Cross's girlfriend had actual authority to consent to the police's search of the room.

Cross's Motion to Suppress was referred to United States Magistrate Judge C.J. Williams, pursuant to 28 U.S.C. § 636(b). On November 1, 2016, Judge Williams held an

---

[1]Cross had previously been charged by a criminal complaint, filed on August 15, 2016, with being a felon in possession of a firearm.

evidentiary hearing on Cross's motion. On November 4, 2016, Judge Williams filed a Report and Recommendation in which he recommends denying Cross's motion. Judge Williams found that Cross had a reasonable expectation of privacy in the whole house and, therefore, had standing to challenge the seizure of evidence from the house. Judge Williams next concluded that the police acted reasonably in relying on Cross's girlfriend's apparent authority to consent to the police's entry into defendant's house while the girlfriend retrieved her personal property. Judge Williams also found that Cross's girlfriend had the actual authority to consent to the police's search of the room.

Cross has filed objections to Judge Williams's Report and Recommendation. The prosecution, in turn, has filed a timely response to Cross's objections. This review follows.

### B. *Factual Background*

In his Report and Recommendation, Judge Williams made the following factual findings:

> Defendant resided in a single-family house in Sioux City, Iowa, which he shared with his grandmother, Andrea Cross, and his minor child. The house was a rental house, and Ms. Cross was the only person listed on the lease. Defendant's girlfriend was Sophia Finauga. At the hearing, Ms. Cross testified that Ms. Finauga had been sleeping in the house "for days" and would occasionally do chores, such as cleaning dishes, but that she did not have a key and did not pay rent or expenses. Ms. Cross testified that the fights between defendant and Ms. Finauga upset her. Ms. Cross also testified that she did not like other people, including Ms. Finauga, staying at the house because it increased Ms. Cross's expenses. Ms. Cross testified that she had asked Ms. Finauga to leave before, but Ms. Finauga did not, and Ms. Cross did not press the issue because Ms. Cross tries to be a nice person.
>
> In the late afternoon of June 4, 2016, Sioux City Police Officer, Paul Yaneff, and two other officers, responded to a 911 call made by Andrea Cross. Ms. Cross reported to the 911

operator that there was a physical fight between defendant and his girlfriend in the bedroom. Ms. Cross did not know Sophia's last name. Ms. Cross stated the officers could enter the house through the front door. The dispatcher related this information to officers, including Officer Paul Yaneff.

When Officer Yaneff and the other officers arrived at the house, they could hear a female voice screaming from inside the house. As officer Yaneff was about to call a supervisor to obtain permission to force entry into the house, Ms. Finauga ran from the house. The officers noticed visible bruising and scratches on Ms. Finauga's face. Officers thought she appeared fearful and scared. When Ms. Finauga noticed the officers, however, she ran back inside the house. She reentered the house through the front door from which she had just exited.

Police officers established a perimeter around the house and called on defendant by loudspeaker to exit the house. Defendant did not do so, even though officers called him by name seven to ten times over a five to seven minute period of time. A short while later, Ms. Finauga left the house. Officers took her to a safe location at the scene.

Officers continued to call over the loudspeaker two or three more times for defendant to come out of the house. Eventually, defendant came out of the house, naked, except for a hand towel he held over his genitals. He claimed he had been showering, but neither he nor the towel were wet. Officers handcuffed defendant. Officers determined there was an outstanding warrant for defendant's arrest. Officers took defendant back into the house and down a hallway where defendant recovered some clothing and the officers helped dress him.

The hallway accessed two bedrooms, one on the left and one on the right, and there was a bathroom at the end of the hall. While pointing out his clothing on the floor of the hallway, defendant attempted to shut the door to the bedroom on the left with his foot. After getting defendant dressed from

4

clothes located in the hallway, officers took him back to a squad car for a few minutes before transporting him to jail. While in the back seat of the car, officers questioned defendant about the injury to Ms. Finauga's eye, and also asked him about her living with him. Upon my review of the recording, I heard the following exchange:

> Officer: [Unintelligble]
>
> Defendant: She stays, she lives, she stays with her mother.
>
> Officer: Okay. She doesn't stay with you, though?
>
> Defendant: [shakes head, while yawning]
>
> Officer: No?
>
> Defendant: Well, she does, but not like . . . [yawns]
>
> Officer: Well, not full time?
>
> Defendant: [Unintelligible, with ambiguous facial expression]

Exhibit C-1 (starting at time mark 00:50 to 01:01). After this exchange, defendant said nothing more about the living arrangements and the officer returned to speaking to defendant about the eye injury.

Before defendant was taken to the jail, Sergeant Hoogendyk spoke on the telephone with Andrea Cross. Sergeant Hoogendyk testified that during this conversation, Andrea Cross told Sergeant Hoogendyk that Ms. Finauga had "recently moved back in" the residence. She stated that there had been many verbal fights between defendant and Ms. Finauga. Andrea Cross also testified about this conversation. She testified that she told the officer that Ms. Finauga could go back into the house to get her stuff, but then she wanted Ms. Finauga gone.

Officer Yaneff spoke to Ms. Finauga about what happened. Officer Yaneff testified that Ms. Finauga was hysterical and breathing hard. Ms. Finauga told Officer Yaneff

that she had been in a relationship with defendant "for a while." She initially claimed her eye injury occurred when she fell into a table. Ms. Finauga soon admitted, however, that the injury to her eye occurred five days earlier when defendant assaulted her inside the residence. She told Officer Yaneff that on this occasion, June 4, 2016, defendant physically assaulted her and broke her cellphone when she attempted to call the police.

Officer Yaneff asked Ms. Finauga if she wanted to call someone to come get her. He explained that she would not be able to live in the residence after this assault because there would be a no-contact order in place and she would not be able to live there if defendant got out of jail. Using one of the officer's phones, Ms. Finauga contacted her mother, who lived in Kingsley, Iowa, to come get her.

Officer Yaneff asked Ms. Finauga if she wanted to collect any of her personal belongings and if she had any inside. Ms. Finauga said she did have belongings inside and asked to collect them from the house and to leave with her mother. Officer Yaneff told Ms. Finauga that she could collect enough belongings to get by for a few days and if she needed to collect more later, she could arrange for an officer to accompany her. Officer Yaneff asked Ms. Finauga if it would be okay for him and a female officer to accompany her into the house while she collected her personal belongings in order to anticipate allegations that she took property she did not own. Ms. Finauga consented.

Officer Yaneff and the female accompanied Ms. Finauga down the hallway from which defendant had earlier grabbed his clothes. Ms. Finauga directed officers toward the bedroom on the left, stating that was where she slept. Officer Yaneff asked if he could stand in the doorway of that bedroom while Ms. Finauga collected some personal belongings. She agreed. When she grabbed a T-shirt from the laundry hamper, a Ruger 9mm caliber pistol fell out. When it hit the floor, the loaded magazine ejected from the pistol. Officer Yaneff saw it and immediately recognized it was a firearm. In response to

6

a question from Officer Yaneff, Ms. Finauga denied any knowledge of the pistol. Officer Yaneff told Ms. Finauga to back away from the firearm, collect the two duffel bags of belongings she had filled, and other belongings she had already grabbed, and leave the residence.

Officer Yaneff then secured the residence and began applying for a search warrant. After obtaining a search warrant, officers found men's clothing, United States mail addressed to defendant, and other personal items in the bedroom where the firearm had been located. In the bedroom across the hall, officers discovered 9mm ammunition, a pipe used to smoke methamphetamine, a marijuana pipe or bong, and clear plastic baggies with a white crystal-like substance that later tested positive as methamphetamine. In the bathroom, officers found a firearm holster that fit the 9 mm pistol, mail addressed to defendant, defendant's cell phone, defendant's debit card, and drug use paraphernalia.

After executing the search warrant, Officer Yaneff went to the jail to speak to defendant. Officer Yaneff informed defendant what officers found. Defendant denied using the bedroom on the left, where officers found the handgun. Defendant claimed he used the bedroom on the right.

During the hearing, the government introduced and played a portion of a recorded phone call between defendant and Andrea Cross. Defendant was in jail at the time. During the phone call, defendant spoke with Ms. Cross about her testimony and statements she had made previously to the Federal Defender's investigator. Defendant asked Ms. Cross what she told the investigator about consenting to officers entering the residence. She replied that she said that Ms. Finauga could get her stuff and go. Defendant replied angrily "that's not what you're going to tell them." A heated exchange followed at the conclusion of which defendant persuaded Ms. Cross to testify that she did not give anyone consent to enter the house.

Report and Recommendation at 2-6 (footnote omitted). After reviewing the record, I adopt all of Judge Williams's factual findings that have not been objected to by Cross.

## II. LEGAL ANALYSIS
### A. Standard Of Review

I review the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see* FED. R. CIV. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge, but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any

8

more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's required *de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has been willing to "liberally construe[]" otherwise general *pro se* objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked

9

specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to me that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). I am unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of

review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[2]

---

[2] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v.*

(Footnote continued . . .

As noted, above, Cross has filed objections to Judge Williams's Report and Recommendation. I, therefore, undertake the necessary review of Judge Williams's recommended disposition of Cross's Motion to Suppress.

### B. Objections To Report And Recommendation

#### 1. *Factual objections*

Cross objects to several of Judge Williams's factual findings. I will address each factual objection in turn.

##### a. *Physical fight*

Cross initially objects to Judge Williams's finding that the police were responding to a 911 call of a "physical fight." Cross argues that what Andrea Cross reported was "a disturbance . . .that sounded physical." Suppression Tr. at 5. Officer Yaneff testified that the police received a call from Cross's grandmother in which she stated: "There's a disturbance in the bedroom regarding Donavan Cross and his girlfriend Sophia that sounded physical." Suppression Tr. at 5. Therefore, Cross's objection is sustained.[3]

##### b. *Handgun in plain view*

Cross next objects to Judge Williams's finding that "an officer observed a handgun in plain view" while Finauga gathered her personal belongings. Report and

---

*Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). Legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g., United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

[3]Once at the scene, the police observed an "obvious eye injury" on Cross's girlfriend. Suppression Tr. at 40.

12

Recommendation at 1. Officer Yaneff testified that he and Officer Roberts accompanied Finauga while she gathered some of her belongings from a bedroom. When Finauga went to grab a t-shirt that was on top of a clothing hamper next to the bed, Officer Yaneff heard "a loud noise that hit the ground." Suppression Tr. at 20. At that point, Officer Yaneff observed "a real handgun. . .with live handgun rounds located next to the gun." Suppression Tr. at 20-21. Thus, while the handgun was not observed by the police until they heard it hitting the floor, when Officer Yaneff first saw the handgun, it was in plain view. Therefore, Cross's objection is overruled.

### c. *Finauga's sleeping in the house*

Cross further objects to Judge Williams's finding that Finauga had been sleeping at the house "for days." Cross's objection misstates Judge Williams's factual finding. Judge Williams actually found that "Ms. Finauga had lived in the house for at least five days. . ." Report and Recommendation at 14.

The record supports Judge Williams's finding. First, Officer Yaneff testified that Finauga had reported to him that Cross had assaulted her at the house on May 31, 2016. Officer Yaneff further testified that he had no reason to believe that Finauga had resided anywhere other than Cross's house between the May 31, 2016, assault and the June 4, 2016, incident. Andrea Cross admitted that Finauga had not left the house recently. Andrea Cross further admitted that Finauga had slept at the house "for a few days" but could not recall how many days Finauga had been sleeping in the house. Suppression Tr. at 61-62. There is no evidence in the record that Finauga had moved from the house between May 31, 2016, and June 4, 2016. Judge Williams could reasonably draw legitimate inferences from these facts and find that Finauga had lived in the house for at least five days. Therefore, Cross's objection is overruled.

### d. *Permission to enter the front door*

Cross further objects to Judge Williams's finding that Andrea Cross "Stated the officers could enter the house through the front door." Report and Recommendation at 3.

13

Cross contends that this finding is inaccurate. Cross argues that Andrea Cross's permission was limited to resolving the dispute between Cross and Finauga. The flaw in Cross's objection is the record does not reveal Andrea Cross placing any limitation or restriction on her permission for police entry into the house. Therefore, in the absence of a limitation or restriction on Andrea Cross's permission for the police to enter the house, Judge Williams's finding is accurate. Therefore, this objection is also overruled.[4]

### e. *Cross's attempt to shut door*

Cross also object to Judge Williams's finding that "[w]hile pointing out his clothing on the floor of the hallway, defendant attempted to shut the door to the bedroom on the left with his foot." Report and Recommendation at 3. Cross denies trying to close the door with his foot. Cross, however, did not testify at the suppression hearing. Moreover, Cross did not challenge Officer Yaneff's testimony on this point at the suppression hearing. In

---

[4]Although not addressed in either the Report and Recommendation or the parties' responses, I find that the issue of Finauga's authority to consent to the police's entry into the house entirely subsumed by Andrea Cross's consent. Given that Andrea Cross gave a general, open-ended consent to the police's entry into the house, I conclude that the police's accompanying Finauga into the house was eminently reasonable and within the scope of Andrea Cross's consent. It is undisputed that Andrea Cross, as the house's only leaseholder, had authority to consent to the police's entry. She did not place any limitation or restriction on her permission for the police to enter the house. Moreover, the fact that Donavan Cross was "formally placed under arrest sometime after the first consent does not work as an automatic withdrawal of the consent previously given." *United States v. Mitchell*, 82 F.3d 146, 150-51 (7th Cir. 1996). In considering the issue of the scope of consent given, a court must apply an objective reasonableness test and ask, "what would the typical reasonable person have understood by the exchange between the officer and [the person granting consent]?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Andrea Cross called the police to intervene in a fight between Cross and Finauga. The police's accompanying Finauga into the house to obtain her clothing was directly related to the purpose of Andrea Cross's call. Therefore, because the police did not go beyond the scope of Andrea Cross's consent, I conclude that Cross has failed to establish a violation of his constitutional rights in connection with the police's accompanying Finauga into the house.

the total absence of any contradictory evidence, Cross's objection is unsupported and overruled.

### f. Finauga's moving back into the residence

Cross's next objection is to Judge Williams's finding that Andrea told Sergeant Hoogendyk that Finauga "recently moved back in" the residence. Report and Recommendation at 4. Cross contends that Andrea Cross told Sergeant Hoogendyk that Finauga recently "showed up" at the residence.

Sergeant Hoogendyk testified that: "[Andrea] explained to me that Sophia had recently moved back into the residence with Donovan. . ." Suppression Tr. at 41. Cross's objection is based on Sergeant Hoogendyk's discussion about Andrea Cross's telephone call with another officer. In that conversation, Sergeant Hoogendyk states that Finauga recently "showed up" at the house. Given the choice between Sergeant Hoogendyk's sworn testimony and his casual statement to another officer, Judge Williams's finding based on sworn testimony is completely understandable. Moreover, Sergeant Hoogendyk's sworn testimony is consistent with Officer Yaneff's testimony on this point. Therefore, this objection is also overruled.

### g. Physical assault

Cross further objects to Judge Williams's finding that: "[Finauga] told Officer Yaneff that on this occasion, June 4, 2016, defendant physically assaulted her and broke her cellphone when she attempted to call the police." Report and Recommendation at 4. Cross argues that there was no credible evidence presented at the suppression hearing that he assaulted Finauga on June 4, 2016. Cross contends that the assault referred to by Officer Yaneff in his testimony occurred on May 31, 2016. However, the record at the suppression hearing supports Judge Williams's finding. In particular, Officer Yaneff specifically distinguished Cross's May 31, 2016, assault on Finauga from the events on June 4, 2016, pointing out that Finauga admitted that her eye injury occurred during the May 31, 2016, assault, but that Cross broke Finauga's cellphone when she attempted to call the police on

June 4, 2016. Moreover, Officer Yaneff testified that another officer offered Finauga the use of that officer's cellphone to contact Finauga's mother because Finauga's cellphone had been broken during the disturbance with Cross on June 4, 2016. Suppression Tr. at 17. Therefore, this objection is also overruled.

### h. Officers' motive for entry into house

Cross also objects "to the extent that the Report and Recommendation attributes a motive for the officers' reentry into the home with Ms. Finauga. It was the officers' idea for Ms. Finauga to return to the home to retrieve property; it was not her idea." Cross's Objection at 5.

Officer Yaneff testified:

> I asked [Finauga] if she would like to take any of her belongings from inside with her to her mother's since I explained there would be a no contact order in place or she can later come back and do a standby to gather things, and she said she wanted to get her stuff today or that day.

Suppression Tr. at 18. Thus, the record reflects that Officer Yaneff informed Finauga that she had to choose whether to get her possessions that day or at a later time with a standby law enforcement officer. It was Finauga's choice to get her possessions that day. Therefore, this objection is also overruled.

### 2. Legal Objection

In light of my conclusion that Donavan Cross has failed to establish a violation of his constitutional rights in connection with the police's entry into the house because the police did not go beyond the scope of Andrea Cross's consent, it is unnecessary for me to reach Cross's objection to Judge Williams's legal conclusion that Finauga had both actual and apparent authority to consent to the police's entry into Cross's house. Nonetheless, I do so.

Cross argues that a reasonable officer would have found that Finauga was an unwelcome guest in the house and, therefore, lacked authority to consent to the police's

entry. Authority to consent can be actual or apparent. Apparent authority is judged by an objective standard. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). The question at issue is whether "the facts available to the officer[s] at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises[.]" *Rodriguez*, 497 U.S. at 188 (citation and internal quotation marks omitted). If so, the search is valid. *Id*. at 189. If not, the search is unlawful unless actual authority existed. *Id.* at 188–89.

Federal courts have found that a defendant's live-in girlfriend had apparent authority to consent to a search of shared premises regardless of the fact that the couple lived together only part time. *See United States v. Penney*, 576 F.3d at 301, 307 (6th Cir. 2009); *see also United States v. Rogers*, 661 F.3d 991, 994 (8th Cir. 2011) ("[W]e note during the course of Officer Puyear's investigation and encounter with Rogers, he learned Rogers had been staying overnight in the apartment with Ms. Spriggs. Thus, the officer could reasonably believe Rogers had authority to consent to an entry into the apartment."); *United States v. Gillis*, 358 F.3d 386, 388–391 (6th Cir. 2004) (finding estranged girlfriend had apparent authority even after an altercation left her locked out of a house she no longer inhabited).

Judge Williams found that the witnesses' testimony at the suppression hearing established that Cross's girlfriend, Finauga, had actual and apparent authority to consent to the police's entry into the house. That finding was supported by the evidence that, *inter alia*, Finauga had been staying at Cross's house for at least five days, keeping clothes there, and that she kept personal belongings in a shared bedroom.

Given these facts, I find the officers held a reasonable belief that Finauga had apparent authority to consent to the police's initial entry into the house. Despite being forced out of the house, the information available to the officers corroborated Finauga's assertion that she lived there. Cross allowed Finauga to live with him, albeit intermittently, and in doing so, he assumed the risk that Finauga could permit unwanted visitors. The officers were entitled to rely on this "assumption of risk," and "there was no burden on the

police to eliminate the possibility of atypical shared occupancy arrangements absent some 'reason to doubt that the regular scheme was in place.'" *Georgia v. Randolph*, 547 U.S. 103, 111–12 (2006)). Finauga provided no such reason. Under these circumstances, the police had enough information at the time of their entry to reasonably conclude that Finauga had apparent authority to consent to their entry. Accordingly, upon a *de novo* review of the record, I accept Judge Williams's Report and Recommendation and deny defendant Cross's Motion to Suppress.[5]

### III. CONCLUSION

Therefore, for the reasons discussed, above, I, upon a *de novo* review of the record, accept Judge Williams's Report and Recommendation. I, alternatively, conclude that because the police did not go beyond the scope of Andrea Cross's consent, defendant Donavan Cross has failed to establish a violation of his constitutional rights in connection with the police's entry into the house. Therefore, defendant Donavan Cross's Motion to Suppress is denied.

**IT IS SO ORDERED**.

**DATED** this 23rd day of November, 2016.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

---

[5] Although the prosecution also argues that Finauga had actual authority, either type of authority is sufficient. In light of my conclusion that Finauga had apparent authority, it is unnecessary to reach the issue of actual authority.